COURT OF APPEALS OF VIRGINIA


Present:  Judges Baker, Coleman and Elder
Argued at Richmond, Virginia


GRETA MARY NESTLE
                                             OPINION
v.        Record No. 2439-94-2    BY JUDGE JOSEPH E. BAKER
                                         APRIL 30, 1996
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF NOTTOWAY COUNTY
                      Thomas V. Warren, Judge

        Joseph D. Morrissey (Morrissey, Hershner &
    Jacobs, on brief), for appellant.

        Steven A. Witmer, Assistant Attorney General
        (James S. Gilmore, III, Attorney General, on brief),
        for appellee.



     Greta Mary Nestle (appellant) appeals from a judgment of the

Circuit Court of Nottoway County (trial court) that approved her

jury conviction of embezzlement in violation of Code § 18.2-111.

 Appellant contends that the evidence is insufficient to support

her conviction; that the trial court erred when it refused to

grant an instruction of petit larceny; that the trial court erred

in admitting evidence relating to money or securities recovered

before the provisions of Code § 19.2-270.2 were complied with;

and erred concerning the admission of evidence and instruction to

the jury concerning pastoral privilege.

     Upon familiar principles, we state the evidence in the light

most favorable to the Commonwealth, granting to it all reasonable

inferences fairly deducible therefrom.  Higginbotham v.

Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

The indictment, pursuant to which appellant was convicted, charged that during 1983, in violation of Code § 18.2-111, appellant wrongfully and fraudulently embezzled money having a value of $200 or more by virtue of her employment with Nottoway County High School (NHS).

On March 1, 1993, appellant became employed as a bookkeeper at NHS. Problems appeared concerning the books and bank deposits. On October 22, 1993, Patricia Harris (Harris), NHS principal, discussed with Dr. James Blevins (Blevins), the Superintendent of Nottoway County Schools, the problem areas she had observed. They discussed the fact that appellant previously had been charged with writing a bad check and decided to order an internal audit. The audit was conducted on October 25, 1993, and the auditor reported several "substantial irregularities in the accounts."

On the evening of October 26, Blevins left a letter concerning the audit under Harris' door. When Harris arrived at the office on October 27, she found the letter open and placed on her desk. Appellant admitted opening the letter but said she had not read it. On occasion, appellant would open envelopes containing Harris' mail, but would not remove the contents.

The letter listed seventeen questions that needed to be answered. Harris testified to three in particular. First, appellant had written a check to herself for $250 on the first day of school and it was never redeposited. The purpose of the

-2-

$250 check was to have one-dollar and five-dollar bills available to give change for book fees on the first day of school. Second, $822.50 of football game receipts, for which appellant was responsible, had not been deposited into the bank. Third, a deposit slip for $1,086 had been stapled to the fund ledger account but no deposit had been made.

On the morning of October 27, Harris and appellant met to discuss the letter. When Harris mentioned the missing $250, appellant stated "I've got that right here" and pulled the money out of a filing cabinet. Harris testified that the $250 was not in the filing cabinet on October 25 when she and the auditor went through the files. Appellant also produced the deposit for the $822.50 in football game receipts. Harris stated that appellant claimed to have deposited the $1,086, but when appellant was confronted with evidence that no deposit had been made, she produced the funds later that day.

On October 29, Blevins ordered an external audit.

On or about November 9 through 12, 1993, appellant took a week's leave to go to Charlottesville, where her child was in the hospital. The external audit was conducted during that time. After reviewing the audit report, Harris and Blevins drove to Charlottesville to meet with appellant. At the meeting, appellant resigned from her position and agreed to meet with Blevins on Monday, November 15, at 9:00 a.m. to discuss the discrepancies. Appellant failed to keep the appointment.

-3-

On Tuesday, November 16, appellant's pastor, Reverend Zolton Phillips, III (the pastor), called Blevins to say that he had found a bag of checks and money belonging to NHS in his car. Blevins retrieved the bag from the pastor. An inventory of the contents of the bag revealed that it contained 438 checks, made payable to "Nottoway High School," totalling over $14,000 and cash in the amount of $1,300.10.

Relevant to this appeal was NHS check 411, dated August 20, 1993, payable to appellant in the sum of $2,150. Using a check writer, appellant prepared the check and presented it to Harris for her signature. Harris signed the check and returned it to appellant. On August 23, 1993, appellant deposited that check into her personal bank account. Appellant's deposit slip indicated $215 as the amount deposited, rather than the $2,150 actually deposited.

Appellant testified that check 411 was supposed to be a reimbursement check in the amount of $21.50 and that she "set" the check writing machine to reimburse herself for that amount but it malfunctioned, as she claimed it had on another occasion.

### Sufficiency

At the time appellant deposited the $2,150 check into her account, the balance in that account was $122.45. Between August 23 and August 27, 1993, she made no other deposits, yet she withdrew cash in the total sum of $485. In addition to the cash withdrawals during the four-day period, checks issued by

-4-

appellant in the sum of $709.67 cleared her account.  Excluding the $2,150, those sums totaled more than her balance even if the alleged $215 deposit was added to the $122.45.  It is clear that appellant intended to and did convert the $2,150 to her own use.

To establish the statutory crime of embezzlement, the Commonwealth must prove that the accused wrongfully appropriated to her use or benefit, with the intent to deprive the owner thereof, the property entrusted to her by virtue of her employment or office.  Waymack v. Commonwealth, 4 Va. App. 547, 549, 358 S.E.2d 765, 766 (1987).  The intent to deprive the owner can be inferred from all the facts and circumstances of the case.  Chiang v. Commonwealth, 6 Va. App. 13, 17, 365 S.E.2d 778, 780 (1988).  The evidence contained in this record clearly proved beyond a reasonable doubt appellant's guilt of the crime of embezzlement.

### Petit Larceny Instruction

Appellant further argues that the trial court erroneously refused a petit larceny instruction because the jury could have concluded that appellant only intended to steal $193.50.  This argument is based upon appellant incorrectly listing $215 as the deposit amount.  Appellant asserts that because she was owed $21.50, deducting that sum left only a balance of $193.50 as the sum stolen, an amount less than the amount necessary to support a felony charge.

Appellant's argument is without merit.  The amount of

-5-

withdrawals and checks drawn on her account disclose only an intent to steal a larger amount. The trial court did not err when it refused to grant the petit larceny instruction requested by appellant.

## Code § 19.2-270.2

Exhibit 17, introduced into evidence over appellant's objection, disclosed that 438 checks and some cash had been discovered in the backseat of a car owned by the pastor of a church of which both appellant and Blevins were members. The pastor turned those items over to Blevins, who caused them to be photocopied. The copies remained with the sheriff and the checks and cash were deposited to the NHS account.

Code § 19.2-270.2 permits the police authorities to retain monies and securities pending trial or appeal, or to release the items when good cause is shown and does not involve the admissibility of the items as evidence. The statute had no application to the introduction into evidence of the money and checks, or copies thereof. Accordingly the trial court did not erroneously admit Exhibit 17 into evidence.

## Pastoral Privilege

Appellant contends that the trial court erred when, in the presence of the jury, the prosecutor asked appellant on cross-examination whether she knew Reverend Zolton Phillips and had been counseled by him as her pastor. That inquiry was made only after appellant testified on her own behalf that she had not

stolen any money from NHS.  After responding in the affirmative,

appellant objected to further questions concerning that

relationship.  Out of the presence of the jury, appellant

successfully prevailed on the trial court to bar any further

pastoral-related questions because she was "exercising" her

"Priest Penitent Privilege."  After sustaining appellant's

objection, the trial court instructed the jury as follows:

> THE COURT:    All right, ladies and
> gentlemen, while you were out the Court heard
> matters regarding conversations with [the
> pastor] while she was counseling with him.
> The evidence is he was at that time her
> pastor, thereby creating a Pastor Penitent
> relationship that all of Virginia recognizes
> a privilege that one has when counseling with
> her pastor or priest.  And it allows the
> person the privilege that he or she may
> exercise as to any conversation, anything
> that was said by or to the priest during that
> relationship.  The defendant has exercised
> her right of privilege, and, therefore, there
> will be no further inquiry in the
> conversations with [the pastor] during that
> relationship.

That instruction did not accurately state the law in Virginia.

> Code § 19.2-271.3 states:
> **Communications between ministers of religion
> and persons they counsel or advise.**--No
> regular minister, priest, rabbi or accredited
> practitioner over the age of eighteen years,
> of any religious organization or denomination
> usually referred to as a church, shall be
> required in giving testimony as a witness in
> any criminal action to disclose any
> information communicated to him by the
> accused in a confidential manner, properly
> entrusted to him in his professional capacity
> and necessary to enable him to discharge the
> functions of his office according to the
> usual course of his practice or discipline,

-7-

> where such person so communicating such
> information about himself or another is
> seeking spiritual counsel and advice relative
> to and growing out of the information so
> imparted.

We hold that under Virginia law, the priest-penitent privilege belongs to the clergyman, not the layman. Our conclusion is guided by <u>Seidman v. Fishburne-Hudgins Educ. Found., Inc.</u>, 724 F.2d 413 (4th Cir. 1984), in which the United States Court of Appeals for the Fourth Circuit decided the identical issue, as it relates to the priest-penitent privilege for <u>civil</u> cases. In <u>Seidman</u>, the defendant contended that the confidential communications made to her priest enjoyed the protection of the priest-penitent privilege. The Court analyzed Code § 8.01-400, which is the civil counterpart to Code § 19.2-271.3, and which utilizes the same operative language found in Code § 19.2-271.3. The Court held that while most priest-penitent statutes "explicitly prohibit the clergyman from disclosing the contents of a confidential communication without the consent of the person making the communication," the language in Virginia's civil priest-penitent privilege statute "plainly invests the priest with the privilege and leaves it to his conscience to decide when disclosure is appropriate." <u>Id.</u> at 415, 416 (quotation omitted). The Court buttressed its conclusion by contrasting Code § 8.01-400's statutory language with other code sections, such as Code § 8.01-399 (physician-patient privilege) and Code § 8.01-400.2

-8-

(psychologist-client privilege).  According to those provisions, the communicant must request or consent to the elicitation of the privileged testimony.  <u>Id.</u> at 416 n.2.

The privilege granted to <u>confessors</u>[1] appears to have been established by the Roman Catholic Church as early as the Fifth Century.  <u>See</u> <u>The Code of Canon Law in English Translation</u>, Canons 983, 984 (Collins, Trans. 1983).  While the common law history of the priest-penitent privilege is less than clear, most scholars agree that pre-Reformation England, out of respect for the Catholic church and the Seal of Confession, recognized a privilege protecting communications made to a <u>confessor</u>.  With the advent of the Reformation and the rise of the Anglican Church in England, however, the privilege was greatly abrogated, if not completely abolished.  Blackstone makes no mention of the privilege in his famed commentaries on the common law, and the case law, what little there is, appears unanimous in denying the privilege.  Thus, most scholars conclude that the priest-penitent privilege is not a part of England's common law legacy.  In fact, a privilege protecting confessional communications is not recognized in England today.

The priest-penitent privilege has fared much better in the

---

[1]**Confessor.**  A priest who receives auricular confessions of sins from persons under his spiritual charge, and pronounces absolution upon them.  The secrets of the confessional were not privileged communications at common law, but are so classified by statute, court decision or court rule in most states.  <u>Black's Law Dictionary</u>, 297 (6th ed. 1990).

United States.  The privilege was first recognized in the United States in 1813.  See People v. Phillips, (N.Y. Ct. Gen. Sess. 1813) (abstracted in 1 W.L.J. 109, 112-13 (1843)).  In Phillips, the defendant had been charged with trafficking in stolen goods.  Prior to trial, Phillips confessed the offenses to his Catholic priest and gave him the stolen property so that it might be returned.  When called upon at trial, the priest would not testify, refusing to violate the canons of his church.  The court, relying upon the priest's freedom of religion as guaranteed by New York's constitution, held that he, in fact, could not be forced to reveal that which he had heard during the administration of the sacrament of Penance.

Four years later, in 1817, a New York court denied the privilege to a Protestant minister who refused to testify regarding confessions made to him by the defendant.  See People v. Smith, 2 N.Y. City Hall Rec. 77 (1817).  The court, distinguishing its case from Phillips, noted that the clergy in Phillips had been a Roman Catholic priest, bound by the rules of the Catholic church, while the clergy before it was Protestant and, as such, not bound by the seal of the confessional.

In 1828, partly in response to Smith, the New York legislature became the first state to enact a statute providing a privilege to confessional communications made to clergy.  The statute read:

> No minister of the gospel, or priest of any
> denomination whatsoever, shall be allowed to
> disclose any confessions made to him in his

> professional character, in the course of
> discipline enjoined by the rules or practice
> of such denomination.

N.Y. Rev. Stat. § 72, pt. 3, ch. VII, tit. III, art. 8 (1828).

Currently, all fifty states have a statute recognizing some form of the priest-penitent privilege. Virginia first enacted a statute granting the privilege in civil trials in 1962 (Code § 8.01-400, enacted as § 8-289.2) and further enacted Code § 19.2-271.3 in 1985, granting the privilege in criminal trials.

As stated earlier, Code § 19.2-271.3 does not give the privilege to the accused. See generally O'Dell v. Commonwealth, 234 Va. 672, 704, 364 S.E.2d 491, 509, cert. denied, 488 U.S. 871 (1988). Because the privilege does not extend to the layman, the trial court erred by extending the pastoral privilege to appellant. That error, however, favored appellant, not the Commonwealth, because appellant was not required to disclose her communication to her pastor.

Unless by her actions appellant waived her Fifth Amendment right against self-incrimination, that remedy would be available to her to prevent the prosecutor from requiring her to reveal the contents of her pastoral counseling. Here, however, appellant testified on her own behalf and denied that she had stolen any money belonging to NHS. Appellant cannot testify on her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination. See Brown v. United States, 356 U.S. 148, 154-56 (1958). Because

-11-

Code § 19.2-271.3 grants no privilege to a criminal defendant, the error committed by the trial court in excluding evidence favored appellant and, therefore, was harmless.

For the reasons stated, the judgment of the trial court is affirmed.

<u>Affirmed.</u>