COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Frank and Humphreys
Argued at Chesapeake, Virginia


STEPHEN WAYNE FERGUSON

MEMORANDUM OPINION[*] BY
v.    Record No. 1667-00-1          JUDGE ROBERT P. FRANK
JULY 24, 2001

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
E. Everett Bagnell, Judge

Steven D. Benjamin (Betty Layne DesPortes;
Benjamin & DesPortes, P.C., on briefs), for
appellant.

Richard B. Smith, Senior Assistant Attorney
General (Mark L. Earley, Attorney General, on
brief), for appellee.


Stephen Wayne Ferguson (appellant) appeals his convictions of

six counts of embezzlement and two counts of conspiracy.  On

appeal, he contends the trial court erred in:  1) finding the

evidence sufficient to support his convictions for embezzlement

and conspiracy; 2) finding the evidence sufficient to prove that a

deprivation of property occurred; and 3) denying his motion to

strike the multiple convictions under the single larceny doctrine.

Finding no error, we affirm appellant's convictions.

————————————
        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

## I. BACKGROUND

Chris Pope worked at the Southside Gin (the company) in Southampton from 1991 to 1998 and began marketing cotton for the company in 1996. Appellant and Sam Pope, Chris's father, were equal partners in the company until 1998, when the ownership changed. At that time, one-third of the company was purchased by Old Dominion Fibers, a corporation owned by Jeffrey Pope, Mark Pope and Chris Pope. Appellant and Sam Pope each had a one-third ownership interest in the company.

During the period between 1996 and 1997, the company built another gin in Wakefield, costing between $3.1 million and $3.2 million. The company also built an oil company. Cost overruns were covered by funds due to farmers for their cotton. Farmers, or cotton producers, would often leave money on deposit with the company, receiving interest on their money, subject to demand for payment.

Chris Pope became the Southampton gin manager in summer 1997, when the company's debt was approximately $1 million. Due to the financial condition of the gin, its government license to store cotton was revoked and this action was made public.

Chris Pope was unable to refinance the gin's debt in summer 1997. He also was unable to reduce the company's short-term debt, which was draining the company's cash flow.

When farmers demanded payment on money they were due, the business was able to meet the demand until late 1997, just before

-

the ginning season. However, there was a run on the demand money after notice of the lost license was made public.

A $620,000 loan from Sam Pope met the farmers' demands up to the 1997 ginning season. Still, $500,000 remained due to the farmers, which the company could not cover.

Appellant was aware of the company's financial plight. He had no additional funds to invest in the company. He had financial problems with a hog farm he independently owned. Appellant also knew of the $1.8 million dollar debt to the farmers. Chris Pope told appellant that he was negotiating loan refinancing with some banks and that if the company could financially survive the 1997 season, the banks might refinance.

In this financial setting, Chris Pope decided he needed to divert cotton from the farmers, sell the cotton bales, and use those proceeds to create a fund to pay the farmers' demands for their money.

Chris Pope's plan was to randomly tag a bale of cotton from a module after the ginning process was completed. The yellow-tagged bale, so selected, would not be entered into the company's computer and the farmer would not be compensated for that bale. The bale would then be sold separately.

Chris Pope stated he first discussed his skimming scheme with the gin's manager, Tom Riddick, prior to the ginning season in September 1997. He stated that he did not tell Riddick what he was going to do with the money. When Riddick agreed to the plan,

-

Chris Pope then told appellant about his plan to make extra money for the company.

Specifically, Chris Pope testified he told appellant, "That I thought we needed to randomly take a bale off a module, not class it and I would look after selling it so the money would be available if we needed it." Chris Pope said that appellant responded, "We needed to make sure that we did what we had to do to make sure the company survived." There was no discussion as to the details or mechanics of the plan.

Chris Pope's plan commenced with the random selection of modules. One of its bales would then be tagged with a yellow warehouse tag carrying a number that always began with "106." These "106" bales would not be scanned into the computer and, thus, not reported to the United States Department of Agriculture. The company's Mexican labor force was told that these bales were not being classed because they were going to a specific mill. During the 1997 season, 911 bales were diverted by this scheme and the funds were paid to Old Dominion Fibers. The "106" bales were not shown on any farmer's payment reports nor were the farmers paid for those bales. Chris Pope and Riddick kept a separate handwritten list of the "106" bales. The total value of the "106" bales in 1997 was $180,000. Chris Pope further testified that he would not have "skimmed" the bales if appellant had not agreed.

Riddick testified that Chris Pope told him about his plan to help the company's cash flow. Riddick claimed that Chris Pope

-

assured him the farmers would be paid. Chris Pope told Riddick he had talked his scheme over with appellant. Riddick testified that on the same day he talked to Chris Pope, appellant asked Riddick if Pope had told him about what Pope had planned.

Riddick testified,

> I said yes, sir, he told me about, you know, marking the modules and pulling the bales off to the side. My first question to Steve [appellant] was was this something you -- you know, you-all really considering doing this. I was concerned, you know, about what they were doing. And Steve made the comment it was something we have to do to survive.

Riddick then asked appellant if his partner, Sam Pope, knew "what was going on." Appellant responded that at that time they felt that Sam Pope did not need to know. Appellant stated that Chris Pope would take care of the money and who needed to know in the office. Appellant told Riddick not to worry about those matters.

Appellant had overall responsibility for the gin's Mexican labor force, who were entitled to a bonus based on the number of bales ginned. Riddick testified appellant was at the gin almost every day in 1997. The workers became concerned in 1997 when they noticed the "106" bales were not being scanned into the computer. Chris Pope told appellant of these concerns as did Evaristo Ambriz, the leader of the Mexican work force.

In early December 1997, Ambriz expressed concern about the "106" bales to Riddick and appellant. When he met with them at

-

the gin, Ambriz directed his comments to appellant who had the final decision on the amount of the bonuses. When Ambriz told appellant to make sure the "unlisted bales" were included in the bonuses, appellant replied, "They've been taken care of," and mentioned the number of bales involved, which Ambriz believed was around 930.

A number of the gin's employees knew that the "106" bales were handled differently. Alex Delgado testified that in loading bales for shipment from the warehouse, he would be provided with a computer printout on the normal bales but was given a paper list of "106" bales to be placed on a particular load.

John Lopez was a forklift operator at the Southampton gin in 1997. He testified that the bales on the dock usually were tagged in sequence. He stated there was a series of "106" bales that were not scanned into the computer, although the other bales were entered. Lopez weighed the "106" bales and kept a record of each bale's number and weight. This list was either picked up or Lopez delivered it to the office. Because part of Lopez's pay came from a bonus on the bales produced, he became concerned that the "106" bales would be excluded from his count.

Prior to the 1998 season, Chris Pope told Riddick and appellant it again would be necessary to "do the same thing" because the company's financial situation had not improved. Pope, however, changed the system by placing every thirteenth tag in a box of bale tags with an out-of-sequence number, and the bales

-

would be scanned in the computer.  These bales were to be taken to the Wakefield facility, owned by Jeff Pope, Chris Pope and Mark Pope.  Appellant again responded that Pope needed to do whatever was necessary for the company to survive.

In 1998, a "312" tag sequence was used for bales removed out of sequence from modules, marked with an "X" and placed separately in the warehouse.  Delgado stated that he and John Lopez "stuffed" the tag boxes with the out-of-sequence tags from a list given to them by Chris Pope.

Riddick stated that in July or August 1998, Chris Pope, Sam Pope, Riddick and appellant met at the gin.  Appellant presided at the meeting.  Appellant asked Chris Pope "about how things were coming along with um --- you know, his plan that he had talked about."  Chris Pope told appellant and the others more details of the plan, specifically tagging the thirteenth bale, using the Wakefield facility and entering the bales into the computer.

When Cecil Byrum's cotton was processed at the Wakefield gin in 1998, Ambriz noticed that every thirteenth bale had an out-of-sequence tag number.  Although the computer showed that sixty bales had been processed, sixty-six bales had actually been ginned.

Appellant denied any knowledge of any plan to deprive the farmers of any cotton or revenue.  Appellant testified he became concerned about the gin's operation in 1996 and also concerned about the Wakefield gin to be built in 1996 or early 1997.  The

-

general manager, Flippin, advised appellant in early 1997 about a lot of cost overruns and that the oil mill and the Wakefield gin were costing a lot more than anticipated.

In late summer 1997, appellant spoke with Chris and Sam Pope about the gin's financial condition. They owed a tremendous amount of money and were in serious trouble. Appellant testified he talked about consulting a bankruptcy lawyer, but Sam Pope refused to discuss bankruptcy when he saw they owed the farmers $1.8 million. At a meeting the next week, however, Sam Pope agreed to put up $500,000 and said he would try to get refinancing.

Appellant testified he had a meeting with Chris Pope during which Pope stated he was planning on not "classing" some cotton because it would save the farmers money. Appellant was assured it was legal to sell unclassed cotton. "Classing" cotton is a process in which a sample of cotton is sent to a federal government facility in South Carolina for classification. By not "classing" it, the cotton could be marketed quicker and would give the business a "competitive edge." Appellant denied any knowledge of skimming or any agreement to do so.

Appellant admitted meeting with Riddick and Ambriz over the workers' concerns that they might not get bonuses on the "non-classed bales." Riddick showed Ambriz several sheets that listed the regular bales and the non-classed bales.

-

Appellant denied that there was a meeting in 1998 to discuss a plan for that ginning year. He further denied ever stating that Chris Pope had to do whatever was necessary for the company to survive.

Appellant acknowledged being aware that farmers were leaving money with the gin, which would have to be repaid upon demand. He knew the gin could not meet all the demands and would have to close without additional funds. Appellant acknowledged that the idea was just to survive the 1997 season and hope for refinancing in 1998. Appellant also acknowledged that he personally had financial difficulties. He admitted he possibly would be broke if the gin did not survive. He had no more funds to put into the gin.

To summarize, appellant testified he did not know the bales were not being shown on the computer, that skimming was occurring, and that the bales were not accounted for to the farmers. His only knowledge was that certain bales were not being "classed" by the United States Department of Agriculture.

Appellant was convicted by the trial court of six counts of embezzlement and two counts of conspiracy.

## II. ANALYSIS

Appellant first contends that the evidence was not sufficient to convict him of embezzlement and conspiracy.

> "Where the sufficiency of the evidence
> is challenged after conviction, it is our
> duty to consider it in the light most

-

favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). Moreover, "[i]f there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion." Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998).

Furthermore, "[t]he credibility of a witness and the inferences to be drawn from proven facts are matters solely for the fact finder's determination. In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citations omitted).

Snow v. Commonwealth, 33 Va. App. 766, 774, 537 S.E.2d 6, 10 (2000).

"To establish the statutory crime of embezzlement, the Commonwealth must prove that the accused wrongfully appropriated to [his] use or benefit, with the intent to deprive the owner thereof, the property entrusted to [him] by virtue of [his] employment or office." Nestle v. Commonwealth, 22 Va. App. 336, 341, 470 S.E.2d 133, 136 (1996) (citing Waymack v. Commonwealth, 4 Va. App. 547, 549, 358 S.E.2d 765, 766 (1987)).

The Commonwealth is not required to prove that the accused intended to permanently deprive the owner of the property.

-

Ketchum v. Commonwealth, 12 Va. App. 258, 261, 403 S.E.2d 382, 383

(1991) (citing Evans v. Commonwealth, 226 Va. 292, 308 S.E.2d 126

(1983)).  "[P]roperty is converted when there has been an

'[u]nauthorized and wrongful exercise of dominion and control over

another's personal property, to exclusion of or inconsistent with

rights of the owner.'"  Id. (quoting Evans, 226 Va. at 297, 308

S.E.2d at 129).

> Proving intent by direct evidence often
> is impossible.  See Servis v. Commonwealth, 6
> Va. App. 507, 524, 371 S.E.2d 156, 165
> (1988).  Like any other element of a crime,
> it may be proved by circumstantial evidence,
> as long as such evidence excludes all
> reasonable hypotheses of innocence flowing
> from it.  See Rice v. Commonwealth, 16 Va.
> App. 370, 372, 429 S.E.2d 879, 880 (1993)
> (citations omitted).  Circumstantial evidence
> of intent may include the conduct and
> statements of the alleged offender, and
> "[t]he finder of fact may infer that [he]
> intends the natural and probable consequences
> of his acts."  Campbell v. Commonwealth, 12
> Va. App. 476, 484, 405 S.E.2d 1, 4 (1991) (en
> banc) (citation omitted).

Adams v. Commonwealth, 33 Va. App. 463, 470-71, 534 S.E.2d 347,

351 (2000).

> "Conspiracy is defined as 'an agreement
> between two or more persons by some concerted
> action to commit an offense.'"  Feigley v.
> Commonwealth, 16 Va. App. 717, 722, 432
> S.E.2d 520, 524 (1993) (quoting Wright v.
> Commonwealth, 224 Va. 502, 505, 297 S.E.2d
> 711, 713 (1982)).  Proof of an explicit
> agreement is not required, and the
> Commonwealth may, and frequently must, rely
> on circumstantial evidence to establish the
> conspiracy.  See Stevens v. Commonwealth, 14
> Va. App. 238, 241, 415 S.E.2d 881, 883
> (1992).  "[A] conspiracy may be inferred from

-

the overt actions of the parties, and a common purpose and plan may be inferred from a development and collocation of circumstances." McQuinn v. Commonwealth, 19 Va. App. 418, 425, 451 S.E.2d 704, 708 (1994) (internal quotations and citations omitted), aff'd en banc, 20 Va. App. 753, 460 S.E.2d 624 (1995).

"Where . . . it has been shown that the defendants 'by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the [fact finder] will be justified in concluding that they were engaged in a conspiracy to effect that object.'" Brown v. Commonwealth, 10 Va. App. 73, 78, 390 S.E.2d 386, 388 (1990) (citations omitted).

Combs v. Commonwealth, 30 Va. App. 778, 787, 520 S.E.2d 388, 392-93 (1999).

Guilty knowledge must be proved against each conspirator but it is only necessary to prove that the defendant conspirator "had such guilty knowledge, no matter how, where or when he acquired it." Sands[v. Commonwealth], 62 Va. (21 Gratt.) [871,] 899-900 [(1872)].

"[L]iability as a conspirator is not dependent on knowledge of the entire scope of the conspiracy. Knowledge need not extend to all the details of the conspiracy, the identity of the other conspirators, the part each member of the conspiracy is to play, or how the spoils of the conspiracy are to be divided." 16 Am.Jur.2d Conspiracy § 14 (1979).

When one accedes to the conspiracy he sanctions what may have been previously done or said by the other in furtherance of the common object. Sands, 62 Va. (21 Gratt.) at 895.

Amato v. Commonwealth, 3 Va. App. 544, 552-53, 352 S.E.2d 4, 9 (1987).

-

Appellant concedes Chris Pope embezzled cotton from the farmers.  We believe the evidence amply supports the trial court's finding that appellant is also guilty of conspiracy and embezzlement.

We first address the embezzlement convictions.  When the cotton bales were removed from the normal stream of production and converted to the perpetrators' use, the embezzlement was complete.  At that point, appellant and his co-conspirators exercised dominion and control over the farmers' cotton inconsistent with the rights of the owners.  Thus, the evidence was sufficient to support the convictions for embezzlement.

Appellant contends the evidence was insufficient to support his convictions for conspiracy.  It is uncontroverted that the company was deeply in debt and could not cover the debt owed the farmers.  Appellant knew of this situation and was, himself, unable to generate funds to further capitalize the business.  Chris Pope told appellant that after the 1997 ginning season he might be able to refinance the debt.

Chris Pope decided on a scheme to divert cotton from the farmers to create a fund to pay the farmers' demands for their money.  Pope told appellant that they would randomly take a bale of cotton off a module, not "class" it, and sell it so the money would be available if needed.  Appellant responded that they needed to do what was necessary to insure the company's survival.

-

There was no discussion at that time of how the plan would be implemented.

Further, appellant was a partner in the company and knew the operation of the business. The fact finder could infer he knew that bales were accounted for by entering them into the computer and that farmers were paid based on the bales produced and sold. Appellant knew that the "106" bales were not entered into the computer. Ambriz, on behalf of the Mexican workers, expressed his concern about the "unlisted bales." Appellant responded, "They had been taken care of." Appellant then spoke to the unhappy workers. He assured them that they would be paid for all of the ginned bales, indicating there would be a print out of the "yellow tag" bales given to the workers. Appellant told the workers that the "yellow tag" bales were being marketed differently. Appellant even knew the number of "skimmed" bales. The fact finder could reasonably infer that appellant knew of the diversion of the cotton.

The evidence further established that appellant suggested secrecy in not revealing the plan to his partner, Sam Pope. When asked whether Sam Pope had been told of the plan, appellant said that Sam Pope should not be informed at that time. Appellant further responded that Chris Pope would take care of "who needed to know." Appellant told Riddick not to worry about these matters. The trial court could infer that appellant concealed the illegality of the plan by not telling his partner, Sam Pope.

-

There was another agreement prior to the 1998 ginning season to divert cotton bales and, thus, deprive the farmers of the income from the sale of those bales. In July or August 1998, appellant presided at a meeting attended by Chris Pope, Sam Pope, and Riddick. Appellant asked for a status report of the "plan." Chris Pope related the details of a new plan whereby every thirteenth bale would be set aside and handled through the Wakefield facility. Earlier, Chris Pope had told appellant that it would be necessary to "do the same thing" because the company's financial condition had not improved. Again, appellant said that they must do whatever was necessary to survive. Knowing of the previous year's plan, appellant clearly approved and agreed to "skimming" the cotton bales for the 1998 season. Appellant denied such a meeting in 1998 to discuss any "plan."

"In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citing Speight v. Commonwealth, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987) (en banc)).

For the fact finder to accept appellant's testimony, the trial court had to believe that appellant, as an active partner, knew nothing of the operations of the gin. The trial court had to believe that appellant had no knowledge that entry of the bales

-

into the computer was required in order for the farmers to be paid.

The fact finder had to believe that appellant, knowing that two sets of records were kept, one for the listed bales and another for the "106" bales, did not know that some bales were being "skimmed."  The fact finder had to believe that appellant chose not to tell his partner, Sam Pope, of a wholly legal marketing plan.  Further, the trial court had to believe that when Chris Pope told appellant that the unclassed bales would be sold so the proceeds would be available, if needed, appellant did not know that the proceeds were being diverted from the farmers.

Appellant next contends the Commonwealth failed to prove that he had the specific intent to deprive the rightful owner of property because the Commonwealth failed to identify the cotton farmers.  Appellant argues that because the clients of Old Dominion Fiber were paid, they were not the subject of embezzlement.  And, because the Commonwealth did not distinguish between the Old Dominion clients and the Southside Gin clients, the Commonwealth did not meet its burden of proof.

Appellant's argument has no merit.  Assuming that the clients of Old Dominion Fiber ultimately were paid for the bales, our embezzlement jurisprudence does not support appellant's theory. It is immaterial whether the farmers got paid at a later date.

-

We next address appellant's contention that he should have been convicted of only one count of embezzlement because all of the larcenous acts were done pursuant to a single intent.

As this Court stated in Acey v. Commonwealth, 29 Va. App. 240, 247, 511 S.E.2d 429, 432 (1999):

> A series of larcenous acts will be considered a single count of larceny if they "are done pursuant to a single impulse and in execution of a general fraudulent scheme." West v. Commonwealth, 125 Va. 747, 754, 99 S.E. 654, 656 (1919). We must consider the following factors when deciding whether the single larceny doctrine applies: (1) the location of the items taken, (2) the lapse of time between the takings, (3) the general and specific intent of the taker, (4) the number of owners of the items taken and (5) whether intervening events occurred between the takings. See Richardson v. Commonwealth, 25 Va. App. 491, 497, 489 S.E.2d 697, 700 (1997). "The primary factor to be considered is the intent of the thief . . . ." See id.

In Richardson v. Commonwealth, 25 Va. App. 491, 497, 489 S.E.2d 697, 700 (1997) (en banc), we held, "[u]nless the evidence proves that two or more separate and discrete thefts occurred at separate times which were not part of the same larcenous impulse, then thefts from the same room are but a single larceny." Id. However, "if different articles are taken from different owners at different times, the thief has committed separate offenses." Id. at 495, 489 S.E.2d at 699 (citation omitted).

In this case, the cotton bales were converted over a period of six to seven weeks. The bales were owned by different farmers. Clearly, time intervened between each act of conversion. While

-

there was a general scheme to convert the cotton bales, there was a separate intent to convert each time the bales were diverted. Under the rationale of Acey and Richardson, the single larceny doctrine does not apply.

Finally, appellant contends there was only one conspiracy. He argues that the 1998 agreement was simply an extension of the 1997 conspiracy. The facts belie this argument.

It is clear that the parties intended for the 1997 conspiracy to end at the conclusion of that season. Chris Pope indicated he was negotiating with banks to refinance the company's debt after the 1997 season. Prior to the 1998 season, the conspirators again met to evaluate the need for the plan to continue for that season. A new agreement and, thus, a new conspiracy arose. It is clear from the facts that the first conspiracy terminated at the end of the 1997 season.

For these reasons, we find the evidence was sufficient to support appellant's convictions of embezzlement and conspiracy, to establish that appellant committed more than one larceny, and to prove that there were two conspiracies. We, therefore, affirm the judgment of the trial court.

Affirmed.