**Norfolk**

FERDINAND THOMAS AMATO, III

v.

COMMONWEALTH OF VIRGINIA

No. 0106-85

Decided January 6, 1987

COUNSEL

H. Woodrow Crook, Jr., for appellant.

W. Mark Dunn, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

BAKER, J. — Fred Amato (appellant), indicted as Frederick Amato, a/k/a Fred Amato, a/k/a Ferdinand Thomas Amato, a/k/a Ferdinand Thomas Amato, III, appeals from a judgment of the Circuit Court of Isle of Wight County (trial court) which approved a jury verdict convicting him of feloniously conspiring to possess with intent to distribute a quantity of marijuana in excess of five pounds. He was sentenced to a term of five years in the penitentiary.

At the conclusion of the Commonwealth's case, appellant moved to strike the evidence, asserting that mere presence at the scene of the conspiracy is not sufficient to support a conspiracy conviction, and that proof of participation in the planning is required. Appellant's motion was overruled and he proceeded to introduce evidence in his behalf. By adducing evidence in his own behalf, appellant waived his right to appeal from the denial of his motion. *Starks v. Commonwealth*, 225 Va. 48, 55, 301 S.E.2d 152, 156 (1983).

When both the Commonwealth and appellant rested their cases, appellant renewed his motion to strike, saying only: "I renew the motion to strike the Commonwealth's evidence on the same grounds and reasons stated at the conclusion of the Commonwealth's evidence." This motion was also overruled. In view of the waiver resulting from appellant's adducing evidence in his own behalf, the sufficiency of the evidence must be determined from the entire record. *Id.*; *Hargraves v. Commonwealth*, 219 Va. 604, 605, 248 S.E.2d 814, 815 (1978).

> Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom. We should affirm the judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.

*Black v. Commonwealth*, 222 Va. 838, 841, 284 S.E.2d 608, 610 (1981) (quoting *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)).

In his brief on this appeal, appellant states that the only issue to be considered by this court is whether there was sufficient evidence upon which the jury could find him guilty of the charge contained in the indictment. The indictment reads as follows:

> The grand jury charges that: On or about July 1, 1981 thru December 4, 1981 in the County of Isle of Wight, Frederick Amato, aka Fred Amato and aka Ferdinand Thomas Amato, aka Ferdinand Thomas Amato, III did feloniously conspire with others to possess with intent to distribute a quantity of marijuana in excess of five (5) pounds. VA CODE SECTIONS 18.2-248.1 and 18.2-256.

The conspiracy which the Commonwealth sought to prove involved a lengthy cast of characters. Their peculiar positions within the conspiracy are important to a full understanding of the scope and dimension of the crime. The alleged conspirators included John Bonner, Thomas Roberts, Jerry Pierce, Russell Moll, Beuford "Buddy" Higgs, William Jarvis, Barry Fullerton, Bruce Stampley, Ralph B. Newman, Jr., Karen Lloyd and appellant, Fred Amato. There were several other minor co-conspirators whose names are not relevant. A DC6 airplane, a gray Lincoln Continental and two dump trucks also played significant roles in the venture.

The conspiracy began sometime prior to November 1981. In October 1981, Bonner came to Virginia from Florida to find a remote airstrip on which a DC6 airplane loaded with $10,000,000 worth of illegal marijuana could land. Bonner and Roberts were the principal co-conspirators who devised the plan. Bonner was taken to the Franklin airport by Moll who described his personal involvement in the operation as a "gopher" for Higgs. At the Franklin airport Bonner and Moll met with Higgs, Stampley and Fullerton. Higgs' specific role is not reflected clearly in the record; however, he appears to have been an intermediary between Bonner and Roberts and the other participants. Stampley was a previously convicted marijuana smuggler who operated in Florida until August 1981, when he was employed by Jarvis and Fullerton as a

crop duster pilot working out of the Franklin airport. Fullerton, who appellant stated at argument was also a previously convicted drug smuggler, was a crop duster pilot who, with Jarvis, owned a crop dusting business. Stampley and Fullerton shared an apartment in Virginia Beach. Jarvis resided in Franklin and was the manager of the Franklin airport. After viewing the runways at the Franklin airport the group agreed that a DC6 could be landed there.

In late November 1981, Moll and Higgs met with Bonner and Roberts in Florida and were told of the plan and the need for personnel to unload the plane. On November 29, 1981, Moll, Higgs, Bonner, Roberts and Pierce flew to Virginia from Florida and landed at the Chesapeake airport. Pierce was the owner of a 1000 acre tract of land in North Carolina where the marijuana was to be transported and distributed after it was unloaded at the Franklin airport. From the Chesapeake airport they went to a nearby motel where the gathering attracted the attention of C. L. McCoy, an alert Virginia state trooper, who was staying at the motel in connection with an ongoing investigation into an unrelated matter. The trooper reported his observations to his superiors, who in turn placed various participants under surveillance.

The next day Pierce and Moll, who had obtained a refrigerated truck, procured the services of Roberts, Newman and several others to assist in the unloading of the plane. Newman was to receive $7500 for providing two dump trucks and was told that the trucks were to be used to transport the marijuana to Pierce's land in North Carolina. The persons employed to unload the plane were to be paid $10,000 each, and Moll, Higgs and Pierce each were to receive approximately $80,000 for their efforts. The landing was to occur after dark. In preparation, Moll purchased a number of needed supplies, including flashlights and batteries.

Appellant and his girlfriend, Karen Lloyd, arrived in Virginia Beach from Florida on November 1, 1981. They returned to Florida on December 31, 1981. Neither was employed during that two month period, yet they rented and lived in a Virginia Beach condominium in the Rudee Inlet area across the street from the apartment occupied by Stampley and Fullerton. Appellant and Stampley were acquainted prior to their coming to Virginia in late 1981. Appellant owned a gray Lincoln Continental which he kept at his Virginia Beach condominium. During the time Stampley

and appellant lived across the street from each other, appellant and Lloyd would see and visit with Stampley at least twice a week.

In the early evening of December 2, 1981, Stampley received a telephone call at his Virginia Beach apartment from Fullerton, who called from the Franklin airport. There was a suggestion of a need for Stampley to come to the airport to "help out." Because he was told that he probably did not want to drive his car, he procured the services of appellant to drive him to the airport in appellant's gray Lincoln Continental.

In preparation for the arrival of the DC6, Newman parked the two dump trucks on a motel lot on Military Highway. In accordance with instructions, in the late afternoon of December 2, 1981, Newman moved the dump trucks to a point near the Franklin airport where he was to be met by another person. Later that night, someone came by driving a gray Lincoln Continental and told Newman to follow the Continental in one of the dump trucks. Newman complied and drove his truck to the airport. He parked the truck, got into the Continental, was driven back to the second dump truck, and drove it back to the airport where he sat awaiting further instructions. A short while later, Jarvis waved Newman into the airport tower. The tower consisted of a large room, two rest rooms and two small offices. Present at the time Newman entered the tower were Jarvis, Stampley, Fullerton and "another fellow" whose name Newman did not know but whom he described as being a young man. At trial, Newman was unable to "positively" identify appellant as the "young man" who was in the tower when he entered, but Stampley testified that appellant was present.

Shortly after Newman entered the airport tower, Stampley and Fullerton discussed the impending arrival of an airplane loaded with marijuana and what was to be done. The participants were suspicious that police were in the airport area. Moll arrived with his crew and two other trucks. With him were Pierce, Roberts, Wilson, and Mancini. Moll testified that Stampley, Fullerton, Jarvis, an older woman and a gentleman whose name he did not know were present when he arrived at the airport. Moll complained to Stampley and Fullerton that he was short two men who were expected to help unload the plane. The "other gentleman" in the room was then identified as "Fred." Stampley and Fullerton

told Moll that Fred would help unload the plane and be paid for his work. Moll heard "a guy say, 'Yea, I'll give a hand.' " The "other gentleman" referred to as Fred was to receive $10,000 for his efforts.

Increasing concern about the presence of police caused Stampley, Roberts and Fullerton to consider an alternative landing strip. The tower facility was kept dark and they studied maps on the floor using flashlights. They concluded that the plane should be diverted to Melfa on the Eastern Shore of Virginia. Roberts instructed Moll and his unloading group to go to Melfa to unload the plane when it arrived there.

Believing that the police followed Moll and his crew as they left the airport to go to Melfa, Roberts and Stampley decided to redirect the plane to Franklin. The plane landed at approximately 1:30 a.m. on December 3, 1981. Appellant and Roberts entered appellant's gray Lincoln Continental and drove down to the plane for the purpose of removing the crew to prevent their capture. Jarvis, Fullerton and Stampley closed the tower and followed appellant's car to the plane in a Volkswagen. The crew was loaded into the Lincoln with Roberts and, driven by appellant, followed the Volkswagen to Jarvis' apartment in Franklin.

Jarvis did not want the group to remain at his apartment, so appellant, the crew, Roberts, and Stampley got back into the Lincoln and drove to appellant's Virginia Beach apartment, where Karen Lloyd was present. Almost immediately, the group decided that Roberts and the crew should leave the State. They were again loaded into appellant's car and driven south. The copilot was dropped off in North Carolina, the others in South Carolina.

In court, Stampley identified appellant as the person he knew as Fred Amato, the "Fred" who was at the airport. Newman could not positively identify appellant as the "other gentleman" called "Fred" at the airport, and Moll's testimony was equivocal: "[It] quite possibly could have been him and quite possibly could not. I can't say yes or no. The other guy that was in there was somebody they called Fred."

The DC6 was taken into custody and authorities found that it was loaded with 610 bales of marijuana valued at approximately $10,000,000.

Appellant adduced evidence on his behalf, including his own testimony. When asked to give his full name he answered: "Ferdinand Thomas Amato, III." He stated that as of October 1984, he was thirty-one years of age. When asked what name he used when he returned to Florida in late December 1981, he replied: "My own name, Fred Amato." When asked if he had ever used any other name he answered: "No, sir." Although appellant testified that his name was Ferdinand Thomas Amato, III, it is apparent that he was generally known as "Fred." While admitting that he owned a gray Lincoln Continental he denied being present at the Franklin airport on December 2 and 3 as testified to by Stampley. He further stated that during the two months he resided in the Virginia Beach condominium apartment across the street from Stampley both he and Karen were unemployed. They spent "a lot" of time at the Raven bar in Virginia Beach and frequently socialized with Stampley in that bar and at their respective apartments. Karen Lloyd did not testify.

Appellant concedes that the evidence amply discloses that the Virginia state police discovered a conspiracy to transport marijuana into Virginia by airplane during the period of November 30, 1981, to December 3, 1981. Fully stated, the conspiracy may be summarized as consisting of a basic plan made in Florida in October 1981 to import a quantity of marijuana valued at $10,000,000 into Virginia by landing a large, four engine airplane in a remote, small airport at night without landing strip or other lights, where it was to be unloaded into trucks which were to be disguised, and transported to a 1000 acre tract of land in North Carolina where the contraband was to be distributed.

The question is whether sufficient evidence was presented from which the jury could reasonably have inferred that appellant was present, knew there was a conspiracy to possess more than five pounds of marijuana with intent to distribute, and agreed to participate in furtherance thereof. We find there was sufficient evidence to support the judgment of the trial court.

"Conspiracy is defined as an 'agreement between two or more persons by some concerted action to commit an offense.'" *Cartwright v. Commonwealth*, 223 Va. 368, 372, 288 S.E.2d 491, 493 (1982) (quoting *Falden v. Commonwealth*, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)); *see Ramsey v. Commonwealth*, 2 Va. App. 265, 270, 343 S.E.2d 465, 469 (1986). When a conspiracy

has been proved, "the acts and declarations of any of the conspirators, in furtherance of the object of the conspiracy, are admissible evidence against each and all of them, though such acts and declarations were not done and said in the presence of all." *Sands v. Commonwealth*, 62 Va. (21 Gratt.) 871, 895 (1872).

> And they are admissible even against a conspirator who did not accede to the conspiracy until after they were done and said. Each conspirator is the criminal agent of every other, and when he accedes to the conspiracy he sanctions what may have been previously done or said by the others, or any of them, in furtherance of the common object.

*Id.* The elements of a conspiracy may be proved by circumstantial evidence. *Wright v. Commonwealth*, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982). Circumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the *only* method of proof. *See Turner v. Commonwealth*, 218 Va. 141, 145-46, 235 S.E.2d 357, 360 (1977); *Toler v. Commonwealth*, 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949). " '[A] common purpose and plan may be inferred from a development and collocation of circumstances.' " *United States v. Godel*, 361 F.2d 21, 23 (4th Cir.), *cert. denied*, 385 U.S. 838 (1966) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "Where it is shown that the defendants by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object." 16 Am. Jur. 2d *Conspiracy* § 42 (1979); *see also State v. Silverthorn*, 195 Okla. 696, 161 P.2d 858 (1945).

 Guilty knowledge must be proved against each conspirator but it is only necessary to prove that the defendant conspirator "had such guilty knowledge, no matter how, where or when he acquired it." *Sands*, 62 Va. (21 Gratt.) at 899-900.

> [L]iability as a conspirator is not dependent on knowledge of the entire scope of the conspiracy. Knowledge need not extend to all the details of the conspiracy, the identity of the other conspirators, the part each member of the conspiracy is to play, or how the spoils of the conspiracy are to be divided.

16 Am. Jur. 2d *Conspiracy* § 14 (1979). When one accedes to the conspiracy he sanctions what may have been previously done or said by the other in furtherance of the common object. *Sands*, 62 Va. (21 Gratt.) at 895.

■ Finally, the participants may be found guilty of conspiracy even though the planned crime was not fully consummated. *See Wright*, 224 Va. at 505-06, 297 S.E.2d at 713. In *Wright*, the record disclosed that at 10:40 p.m. a policeman observed an unoccupied automobile parked in a dark, weeded area twenty-five feet off the gravel portion of a parking lot in such a position that it could not be seen from the road. The nearest light was at a McDonalds's restaurant, approximately three hundred feet away. The weeded area where the automobile was parked led to the McDonald's parking lot. The officer noted that the car's engine was still warm. He looked inside the car, then went to another place to observe the car without himself being seen. He called for assistance and other officers responded by entering McDonald's parking lot in marked vehicles. After maintaining surveillance for about twenty-five minutes, the officer observed the defendants coming from the vicinity of McDonald's restaurant and saw them place an object in the center of the trunk of the automobile. As defendants attempted to drive away, the car was stopped by the other officers. Two stocking masks, a black skullcap, two ski caps, and a pair of brown gloves were found between the two front seats of the car. These items were not present when the first officer examined the car. A .38 caliber revolver was found lying in the trunk of the car approximately where the officer had seen "the pair" place an object. There was no other object near the gun. Wright's clothing had weeds on it similar to those in the area between McDonald's and his car. No robbery or overt attempt to rob McDonald's was shown. The court held that from the above evidence the trial court could conclude that there was sufficient evidence from which it reasonably could be inferred that the two men had an agreement between themselves to commit the robbery. *Id.* at 504-06, 297 S.E.2d at 712-13.

In the present case, a conspiracy was proved. There is ample evidence in the record from which the jury could have inferred that the man referred to as "Fred" was in fact appellant and that he was an active participant in the plan to import illegal marijuana. The only reasonable hypothesis from this record is that ap-

pellant knew of the conspiracy and agreed to participate in its completion. Searching in this record for an hypothesis other than appellant's knowledge of the conspiracy would be an exercise in imagination. The Supreme Court of Virginia has not placed a burden on the Commonwealth to "exclude every *possible* theory or surmise."

> We place too great a burden on the Commonwealth if we require it to exclude every possible theory or surmise presented by the defense. Our precedents do not require this. The hypotheses which the prosecution must reasonably exclude are those "which flow from the evidence itself, and not from the imagination of defendant's counsel."

*Black v. Commonwealth*, 222 Va. 838, 841, 284 S.E.2d 608, 609 (1981) (citation omitted). The Commonwealth's burden has been met. As was said by Justice Stephenson in *Wright*, appellant's "actions were consistent with illegality and inconsistent with legality." *Wright*, 224 Va. at 505, 297 S.E.2d at 713. Considering all the circumstances shown by the record, the jury reasonably could have inferred from the evidence that appellant was aware of the plan to import the marijuana and agreed to and did act in concert with others in furtherance of the crime.

Accordingly, the judgment of the trial court is

*Affirmed.*

Koontz, C.J., and Keenan, J., concurred.