COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Bumgardner
Argued at Salem, Virginia


EDWARD HAROLD NELSON, SR.

                                    MEMORANDUM OPINION* BY
v.    Record No. 0350-01-3            JUDGE LARRY G. ELDER
                                       DECEMBER 18, 2001
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
                 William N. Alexander, II, Judge

           (Mary E. Harkins, on brief), for appellant.
           Appellant submitting on brief.

           (Randolph A. Beales, Attorney General; Eugene
           Murphy, Assistant Attorney General, on
           brief), for appellee.  Appellee submitting on
           brief.


     Edward Harold Nelson, Sr., (appellant) appeals from his

jury trial convictions for conspiracy to commit murder in

violation of Code §§ 18.2-22 and 18.2-30 and breaking and

entering with an intent to commit murder while armed with a

deadly weapon in violation of Code § 18.2-89.  On appeal, he

contends the evidence was insufficient to prove that (1) he

entered into the agreement required for the conspiracy

conviction and (2) he was a principal in the second degree to

the breaking and entering.  We hold the only reasonable

hypothesis flowing from the circumstantial evidence was that

---

        * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

appellant conspired with his son-in-law to kill his daughter's boyfriend and that he aided and abetted the son-in-law's breaking and entering in order to commit that offense.  Thus, we affirm appellant's convictions.[1]

On appellate review, we examine the evidence in the light most favorable to the Commonwealth, and we may not disturb the jury's verdict unless it is plainly wrong or without evidence to support it.  See Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988).  On issues of witness credibility, we defer to the conclusions of "the fact finder[,] who has the opportunity of seeing and hearing the witnesses."  Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985). The fact finder is not required to believe all aspects of a witness' testimony; it may accept some parts as believable and reject other parts as implausible.  See Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993).

Any element of an offense may be proved by circumstantial evidence.  See Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983).  "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence,"

---

[1] Appellant does not challenge the sufficiency of the evidence to prove his son-in-law committed the offense of breaking and entering with an intent to commit murder while armed with a deadly weapon.  He contends only that the evidence was insufficient to prove he aided and abetted that offense. Thus, we do not separately consider the sufficiency of the evidence to prove his son-in-law's guilt as a principal in the first degree.

-

provided the evidence as a whole is sufficiently convincing to exclude all reasonable hypotheses of innocence.  Id.

An aider and abettor, also known as a principal in the second degree, is one who is "present . . . and intend[s] his or her words, gestures, signals, or actions to . . . encourage, advise, urge, or in some way help the person committing the crime to commit it."  McGill v. Commonwealth, 24 Va. App. 728, 733, 485 S.E.2d 173, 175 (1997).  Although "mere presence and consent are not sufficient to constitute one an aider and abettor," Jones v. Commonwealth, 208 Va. 370, 373, 157 S.E.2d 907, 909 (1967), proof that one "'is present at the commission of a crime without disapproving or opposing it[] is evidence from which, in connection with other circumstances, . . . the [fact finder may] infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same,'" Foster v. Commonwealth, 179 Va. 96, 100, 18 S.E.2d 314, 316 (1942) (citation omitted) (emphasis added).

A principal in the second degree is criminally responsible for all acts committed in furtherance of "'the common [criminal] purpose,'" as long as they are "'incidental probable consequences of the execution of that [purpose],'" regardless of whether the acts are "'part of the original design.'"  Brown v. Commonwealth, 130 Va. 733, 738, 107 S.E. 809, 811 (1921)

-

(quoting 1 Wharton's Criminal Law § 258, at 329-30 (11th ed. 1912)), quoted with approval in Rollston v. Commonwealth, 11 Va. App. 535, 542, 399 S.E.2d 823, 827 (1991).

A conspiracy, on the other hand, "is . . . 'an agreement between two or more persons by some concerted action to commit an offense.'" Wright v. Commonwealth, 224 Va. 502, 505, 287 S.E.2d 711, 713 (1982) (quoting Falden v. Commonwealth, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)). The crime is "complete when the parties agree to commit an offense," and "[n]o overt act in furtherance of the underlying crime is necessary." Gray v. Commonwealth, 260 Va. 675, 680, 537 S.E.2d 862, 865 (2000). Thus, "the participants may be found guilty of conspiracy even though the planned crime was not fully consummated." Amato v. Commonwealth, 3 Va. App. 544, 553, 352 S.E.2d 4, 9 (1987).

Proof of an explicit agreement is not required, and the Commonwealth may, and frequently must, rely on circumstantial evidence to establish the existence of a conspiracy. See Stevens v. Commonwealth, 14 Va. App. 238, 241, 415 S.E.2d 881, 883 (1992). Although no overt act is necessary to establish a conspiracy, the parties' "'overt conduct'" may support a finding of the existence of a conspiracy, Poole v. Commonwealth, 7 Va. App. 510, 513, 375 S.E.2d 371, 372 (1988) (quoting United States v. Harris, 433 F.2d 333, 335 (4th Cir. 1970)), and "a common purpose and plan may be inferred from a 'development and

-

collocation of circumstances,'" Floyd v. Commonwealth, 219 Va. 575, 581, 249 S.E.2d 171, 175 (1978) (quoting United States v. Godel, 361 F.2d 21, 23 (4th Cir. 1966) (quoting Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L. Ed. 2d 680 (1942) (quoting United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939)))).

> "Where it is shown that [the parties] by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object."

Amato, 3 Va. App. at 552, 352 S.E.2d at 9 (quoting 16 Am. Jur. 2d, Conspiracy § 42 (1979)).

"In order to establish the existence of a conspiracy, as opposed to mere aiding and abetting, the Commonwealth must prove 'the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting.'" Zuniga v. Commonwealth, 7 Va. App. 523, 527, 375 S.E.2d 381, 384 (1988) (quoting United States v. Peterson, 524 F.2d 167, 174 (4th Cir. 1975)).

Here, the circumstantial evidence supported the jury's finding that appellant and his son-in-law, Cletis Junior Roberts, had entered into an agreement to kill Arthur Simpson by the time they arrived at Simpson's residence in the early

-

morning hours of December 26, 1999.  This same evidence supported its finding that appellant aided and abetted Junior's breaking and entering with intent to commit murder while armed with a deadly weapon.  At about 9:00 p.m. on December 25, 1999, appellant was angry with his daughter, Catherine Roberts, when he thought she had left Jessup, appellant's infant grandson whom appellant supported financially, with Simpson.  Appellant told Catherine he would kill Simpson if she had, in fact, left Jessup with Simpson.  While making this threat, appellant removed his .45 caliber handgun from a nearby drawer and displayed it prominently on the coffee table which stood between him and Catherine.  Catherine said appellant did not "make idle threats about killing people," and she took the threat seriously enough to warn Simpson.  Simpson knew appellant was not fond of him and took the threat seriously enough to obtain a firearm and bullets that same night, shortly after receiving the warning.

An hour or two after appellant's argument with Catherine, appellant was still thinking about Catherine's relationship with Simpson.  Appellant asked Catherine's friend, Amanda, why Catherine "love[d] [Simpson] so much."  Shortly thereafter, appellant and Junior agreed to go to Simpson's residence.

Although appellant did not say why he and Junior agreed to go to Simpson's, the only reasonable hypothesis flowing from the circumstantial evidence was that they agreed to do so in order to kill Simpson.  Before going to Simpson's residence, a drunken

-

appellant called Amanda's residence twice, at 12:30 a.m. and again around 2:00 a.m., "to make sure that Amanda was at home and not at . . . Simpson's." The purpose of appellant's and Junior's trip to Simpson's residence was important enough to them to take Catherine's four-year-old son, Joey, out in the middle of the night to help them find Simpson's residence, and it apparently also was important enough for them to risk a drunk driving citation or related accident. Although the record does not make clear who drove Junior's car to Simpson's, Junior had a blood alcohol concentration of .22, almost three times the legal limit; appellant also had been drinking.

Very shortly after appellant's second telephone call to confirm that Amanda was not at Simpson's, Junior and appellant arrived at Simpson's residence. Junior pounded on the door and yelled at Catherine and Simpson to come out. Junior said that appellant was there with him and that "they were going to kill [Catherine and Simpson]." (Emphasis added). Appellant did not disclaim Junior's threat, and the circumstantial evidence supported a finding that appellant stood nearby armed with the same .45 caliber handgun he had displayed to Catherine hours earlier when he had threatened to kill Simpson. When Catherine yelled to appellant to take Junior home, appellant did not respond. Immediately after Junior broke down the door and Simpson shot him, Simpson and Catherine each separately encountered the armed appellant directly outside the door.

-

Simpson called to appellant for help, but instead of offering help, appellant said he would kill Simpson if Simpson had killed Junior. Simpson then fled through the back door, and as Catherine tried to escape through the front door, she saw the gun in appellant's hand, and appellant struck her in the head with it.

After police arrived at the scene and found appellant on the front porch of the nearby Furrow residence, they spotted a clip loaded with bullets in the front of that house, and they found appellant's .45 caliber handgun and another loaded clip hidden beneath some leaves behind a fence post halfway between the Simpson and Furrow residences.

The only reasonable hypothesis flowing from the "'development and collocation of circumstances,'" Floyd, 219 Va. at 581, 249 S.E.2d at 175 (quoting Godel, 361 F.2d at 23 (quoting Glasser, 315 U.S. at 80, 62 S. Ct. at 469 (quoting Manton, 107 F.2d at 839))), including appellant's prior threat to kill Simpson and the display of his handgun, and Junior's threat upon their arrival at Simpson's residence that they were there to kill Simpson, accompanied by appellant's immediate armed presence with the handgun he previously had displayed to Catherine when he threatened to kill Simpson, his failure to disclaim Junior's threat, and his subsequent threat to kill Simpson if Simpson had killed Junior, is that appellant and Junior had entered into an agreement to kill Simpson.

-

This same evidence supports the jury's finding that appellant was a principal in the second degree to Junior's breaking and entering into Simpson's residence with intent to commit murder while armed with a deadly weapon. Contrary to appellant's argument that he was merely present at the scene, the evidence established that appellant agreed to accompany Junior to Simpson's residence, phoned Amanda's house twice to be sure she was not at Simpson's, and stood, armed, with Junior outside Simpson's residence as Junior threatened its occupants and kicked in the door. Appellant's failure to disclaim Junior's threat or to respond to Catherine's request to calm Junior, although not dispositive of appellant's guilt, provides additional circumstantial evidence both that he shared Junior's criminal intent and that he intended, by his armed presence, to help Junior commit the breaking and entering.

For these reasons, we hold that the only reasonable hypothesis flowing from the circumstantial evidence, viewed in the light most favorable to the Commonwealth, was that appellant conspired with Junior to kill Simpson and that he aided and

-

abetted Junior's breaking and entering in order to commit that

offense.  Thus, we affirm appellant's convictions.[2]

Affirmed.

---

[2] As a final matter, we note our concern with the performance of appellant's court-appointed counsel in the prosecution of this appeal.  Rule 5A:20 requires that a party's brief on appeal "shall contain the principles of law, the argument, and the authorities relating to each question presented."  (Emphases added).  Despite the serious nature of the issues on which this appeal was granted, appellant's court-appointed counsel cited no authority for her claim that the evidence was insufficient to support the convictions.  The argument section itself comprises less than one page of counsel's three-and-one-half-page brief and can in no way be said to constitute zealous representation.  See, e.g., Va. Rules of Professional Conduct, Preamble, ¶2 ("As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system."); id. Rule 1.3 cmt. [1] ("A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").  Although we do not view the shortcomings in appellant's brief as sufficient to warrant dismissal of the appeal, we also do not wish to encourage their repetition.