COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Malveaux and Causey
Argued at Norfolk, Virginia


ALTON KASINE POWERS

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 0082-23-1          JUDGE MARY BENNETT MALVEAUX
                                                   APRIL 30, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Christopher R. Papile, Judge

Charles E. Haden for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Alton Kasine Powers ("appellant") was convicted by a jury for first-degree murder, in

violation of Code § 18.2-32, conspiracy to commit murder, in violation of Code §§ 18.2-22

and -32, and use of a firearm in the commission of murder, in violation of Code § 18.2-53.1.

Appellant contends that the trial court erred in denying his motion to strike, because the evidence

was insufficient to prove that he committed the three offenses and there was no evidence of a

conspiracy to kill the victim.  For the following reasons, we disagree and affirm the ruling of the

trial court.

I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Stewart v.*

*Commonwealth*, 79 Va. App. 79, 81 (2023) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

(2018)).  "In doing so, we discard any of [appellant's] conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *King v. Commonwealth*, 77 Va. App. 748, 755 (2023).

Stephen White was shot to death in the parking lot of a Newport News apartment complex on the night of April 17, 2020.  Police found White's body lying face down, exhibiting multiple injuries; an autopsy revealed that White had been shot at least 14 times, including in the neck, chest, torso, and abdomen.

A police forensic specialist recovered 41 cartridge cases in 3 different calibers from the parking lot where White was killed.[1]  She also attended White's autopsy and recovered 13 bullets and numerous bullet fragments from his body, which, together with the cartridge cases, were subsequently analyzed by the Virginia Department of Forensic Science.  The certificate of analysis produced by the department, which was admitted into evidence at trial, indicated that the rounds recovered from White's body had been fired by guns of three different calibers that corresponded to the calibers of the cartridge cases.  The certificate further indicated that each cartridge case recovered from the parking lot where White was killed had been fired by one of three guns.

Police also obtained video surveillance footage from multiple security cameras located throughout the grounds of the apartment complex.[2]  Both the raw surveillance footage and a compilation of suspicious events appearing in the footage were entered into evidence at trial.  The videos indicated that at 11:24 p.m. on April 17, 2020, a white car drove into the apartment complex and parked.  Over the next two minutes, four men left the car individually, at staggered intervals,

_____

[1] Specifically, police recovered 17 cartridge cases that were 7.62x39mm in caliber, 16 cartridge cases that were 5.7x28mm in caliber, and 8 cartridge cases that were 9mm in caliber.

[2] At trial, the detective who obtained the footage from a private security company testified that although the initial images he received were "grainy," the following day the company provided better, "HD quality video footage."

and began walking deeper into the complex. The first man wore a light-grey hoodie and track pants with a white stripe; the second man, appellant, wore a dark-grey hoodie and dark pants; the third man wore a black hoodie, a medical mask, and light-colored pants; and the fourth man wore a grey hoodie, dark track pants with a white stripe, and red shoes. About three minutes after the four men walked off, the white car left the parking lot.

The first three men, walking together or loosely trailing each other, walked throughout the apartment complex for the next ten minutes. The fourth man, walking separately, encountered White next to one of the complex's parking lots. During a brief conversation, White pulled out and activated a cell phone before handing it to the fourth man; after holding the phone for a moment, the man returned the phone to White. White and the fourth man parted company shortly thereafter, and the fourth man then left the apartment complex.

Shortly after White and the fourth man parted company, the other three men from the white car passed directly in front of one of the security cameras, which captured close images of their faces. At trial, the Commonwealth introduced into evidence photographic enlargements of appellant's face that were produced from this surveillance footage. It also introduced two photographs of appellant wearing a grey hoodie; the photographs had been taken in April 2020 by a person appellant was dating at that time, and thus they were contemporaneous with the shooting.

Less than two minutes after the men passed in front of the surveillance camera, they encountered White in the parking lot where White's body was later found. They engaged White in conversation for a few seconds before the three men simultaneously raised their arms in White's direction; the surveillance footage then captured a series of muzzle flashes from multiple guns before White fell to the ground. The Commonwealth introduced into evidence at trial a photographic enlargement of the shooting that was taken from the surveillance footage.

Immediately after the shooting, two of the three men, including appellant, fled the scene, followed closely by the third man after he first stood over White and fired several more shots at him.

Police subsequently obtained a search warrant for a white car parked at 704 Macon Road in Hampton; at trial, one of the detectives involved in the investigation of White's death described the car as bearing a "striking resemblance" to the white car seen in the surveillance video. In the car, a Lexus registered to Sh'Kise Cappe, police found Cappe's license and other identification, along with a cartridge case. Forensic analysis subsequently determined that the cartridge case had been fired by the same gun that fired 17 of the cartridge cases found at the scene of the shooting.

Police also obtained search warrants for a number of cell phone accounts. Ultimately, they developed and analyzed data related to four cell phone numbers, the downloaded contents of two cell phones, belonging to White and Dajour Pemberton, and the phone records of a business, "Pop-a-Lock" locksmith. At trial, a detective from the police technical investigations unit testified as an expert in call detail and geolocation records and cell phone download analysis. He opined that based upon the data he analyzed, at 9:30 p.m. on the night of White's death, the cell phone associated with Sh'Kise Cappe was in the area of 704 Macon Road in Hampton; also, over the next hour and 20 minutes, the cell phones associated with appellant, Dajour Pemberton, and Unique Perry also were present in that area at various times.

At approximately 10:50 p.m., the cell phones associated with Cappe and Perry traveled into Newport News. Shortly thereafter, the cell phone associated with Cappe ceased connecting to the cell phone network, but by approximately 11:20 p.m., the cell phones associated with Perry and Pemberton were in the area of the apartment complex where White was shot. Eleven minutes later, White's phone placed an outgoing call to the phone associated with Perry; this was at the moment when a surveillance camera captured images of White producing and activating a cell phone before

handing it to the man in the red shoes. Six minutes later, White was shot by the other three men from the white car.

By approximately 11:45 p.m., less than ten minutes after the shooting, the cell phone associated with Perry had left the vicinity of the apartment complex. At 12:21 a.m. the next morning, the phone associated with appellant called Pop-A-Lock Locksmith from the vicinity of 704 Macon Road. Pop-A-Lock later provided police with an invoice indicating that on the morning of April 18, 2020, a Toyota Camry at 704 Macon Road was unlocked for a customer named "Kas Powers" who provided appellant's driver's license number. The police cell phone records expert also testified that at approximately 2:30 a.m. on April 18, 2020, the phones associated with both appellant and Perry were in the vicinity of 704 Macon Road and that at 9:51 a.m. that morning, when Pop-A-Lock called the cell phone associated with appellant, that cell phone was in that vicinity.

At trial, after the Commonwealth presented its case-in-chief, appellant moved to strike the evidence on all three charges. The trial court denied the motion, holding that with respect to the issue of identity, the video and "other visual evidence," including still photographs, were "sufficient evidence to go to the jury." Appellant presented no evidence and renewed his motion to strike. The trial court denied that motion as well, "[f]or the same reasons."

The jury convicted appellant of all three charges. This appeal followed.

## II. ANALYSIS

Appellant argues that the trial court erred in denying his motion to strike because the evidence was insufficient for the jury to convict him of first-degree murder, use of a firearm in the commission of murder, and conspiracy to commit murder.

"In the context of a jury trial, a trial court does 'not err in denying [a] motion to strike the evidence [when] the Commonwealth present[s] a *prima facie* case for consideration by the fact

finder.'" *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (alterations in original) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)). Thus, a motion to strike "challenges whether the evidence is sufficient to submit the case to the jury." *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013). "In this Court's review of the sufficiency of the evidence, we will not disturb the judgment of a jury unless it is 'plainly wrong or without evidence to support it.'" *Davis v. Commonwealth*, 79 Va. App. 123, 147 (2023) (quoting Code § 8.01-680). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Washington v. Commonwealth*, 75 Va. App. 606, 615 (2022) (alteration in original) (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020)). "Instead, the 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'" *Davis*, 79 Va. App. at 148 (alteration in original) (quoting *Commonwealth v. Barney*, 302 Va. 84, 89 (2023)). "In applying this standard of review, we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient. Instead, in an appellate sufficiency review, the evidence is 'considered as a whole.'" *Barney*, 302 Va. at 89 (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). Thus, "while no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion.'" *Id.* (alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)).

"Additionally, it is the function of the trier of fact, in this case the . . . jur[y], to determine the credibility of the witnesses and the weight afforded the testimony of those witnesses." *Davis*, 79 Va. App. at 148. We "do[] not revisit these determinations on appeal unless reasonable people, 'after weighing the evidence and drawing all just inferences therefrom, could reach [only

the contrary] conclusion.'" *Id.* (second alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)). "Furthermore, '[o]ur deference . . . is not limited to matters of witness credibility. We owe deference to the [fact-finder's] interpretation of all of the evidence, including video evidence that we are able to observe much as [they] did.'" *Lucas v. Commonwealth*, 75 Va. App. 334, 343 (2022) (first two alterations in original) (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022)). "Such deference stems . . . from the difference in our respective roles." *Meade*, 74 Va. App. at 806. "As factfinder, a [jury] views video and other evidence to determine what it believes happened; we, on appellate review, view video evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the [jury] did." *Id.*

A. First-Degree Murder and Use of a Firearm in the Commission of Murder

Appellant challenges the sufficiency of the evidence that he "was one of the three gunmen who murdered Stephen White." Noting that no fingerprint or DNA evidence placed him at the scene of the crime and that he made neither a confession nor incriminating statements to police, appellant contends that "the evidence . . . fails to prove that [he] had anything to do with" White's death or was "even present at the crime scene."[3]

"At trial, the Commonwealth bears the burden of proving the identity of the accused as [a] perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). Identity, as with any

---

[3] Additionally, while appellant acknowledges the video footage of "three . . . gunmen opening fire on White," he maintains that the footage was "blurry" and "lacked the clarity and resolution" to prove that he was one of the gunmen. Appellant, however, does not contend that the Commonwealth's video evidence was improperly admitted because it lacked relevance or otherwise should have been excluded from admission and presentation to the jury. Accordingly, on appellate review, we owe deference to the jury's determination of the quality and clarity of the video evidence in making its ultimate determination of "what it believe[d] happened" during the shooting, and do not address the argument about video clarity raised by appellant. *Meade*, 74 Va. App. at 806.

element of an offense, may be proved by direct or circumstantial evidence. *See Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Clark v. Commonwealth*, 78 Va. App. 726, 751-52 (2023) (quoting *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc)). "We review the fact finder's determination regarding the identity of the perpetrator considering 'the totality of the circumstances.'" *Shahan*, 76 Va. App. at 258 (quoting *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002)).

We disagree with appellant's contention that the evidence was insufficient to prove his identity as one of White's killers, or even to place him at the scene of the crime. The jury had before it extensive footage from multiple security cameras that captured events at the apartment complex on the night of the shooting. The jurors were able to watch footage of a white car arriving at the complex and four men emerging from the car and then circulating throughout the complex. At one point, three of the men, including appellant, walked directly in front of one of the surveillance cameras, which captured images of their faces at close range; the jurors also viewed enlarged still photographs prepared from this footage that depicted the faces of the three men. The video evidence then depicted the three men encountering White in a parking lot less than two minutes later, at which point the men spoke briefly with White before raising their arms toward him and opening fire.[4] The jury had the opportunity to view not only this footage and related still photographs of appellant, but also photographs of appellant that were taken in April 2020, contemporaneously with the shooting, by one of appellant's acquaintances. Moreover, all

---

[4] Appellant acknowledges on brief that there were "three gunmen" who killed White, and the evidence supports this. Not only does the video evidence demonstrate that all three men who encountered White in the parking lot, including appellant, pointed and discharged firearms at White, the forensic evidence recovered from White's body, and cartridge cases recovered from the parking lot, also supports the finding that there were three shooters.

these images of appellant were available to the jury to compare with their observations of appellant during a multi-day trial, as the jury sought to determine if appellant was one of the killers depicted in the video surveillance footage.

The jury also had before it circumstantial evidence that implicated appellant as one of the gunmen. The Commonwealth presented expert testimony that associated appellant's cell phone with other cell phones that gathered around 704 Macon Road in the hours immediately prior to the shooting. Some of those other cell phones then traveled to the area of the apartment complex shortly before the shooting took place, interacted with White's cell phone minutes before White was shot, and then returned to the area of 704 Macon Road shortly after the shooting. Appellant's cell phone was also present at 704 Macon Road in the early and mid-morning hours of the next day, as evidenced by call records from that phone and from the locksmith who later opened a car for "Kas Powers," who provided appellant's driver's license number, at that address. Also associated with that address was a white car registered to an account holder of one of the other cell phones, which a detective investigating White's death described as bearing a "striking resemblance" to the white car visible in the surveillance video. From this circumstantial evidence, the jury could reasonably have inferred that appellant met with other individuals at 704 Macon Road prior to the shooting, traveled with them in the white car to the apartment complex, and then returned to 704 Macon Road after the shooting.

Based upon the totality of this visual and circumstantial evidence, and the reasonable inferences flowing from it, a rational fact-finder could have concluded that appellant was one of the three men who shot White dead in the apartment complex parking lot. Accordingly, we find no error in the trial court's denial of appellant's motion to strike the evidence of first-degree murder and use of a firearm in the commission of murder.

B.  <u>Conspiracy to Commit Murder</u>

Appellant argues that the Commonwealth's evidence failed to prove that he entered into an agreement with any other individual to kill White and that it also "failed to exclude the possibility that the shooting was a spontaneous, unplanned action rather than the product of an agreement beforehand." Accordingly, appellant maintains, the conspiracy charge should have been struck by the trial court.

A conspiracy is "an agreement between two or more persons by some concerted action to commit an offense." *Speller v. Commonwealth*, 69 Va. App. 378, 389 (2018) (quoting *Wright v. Commonwealth*, 224 Va. 502, 505 (1982)). "There can be no conspiracy without an agreement, and the Commonwealth must prove beyond a reasonable doubt that an agreement existed." *Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 277 (2015) (quoting *Feigley v. Commonwealth*, 16 Va. App. 717, 722 (1993)). "Nevertheless, a conspiracy may be proved by circumstantial evidence." *Id.* (quoting *Floyd v. Commonwealth*, 219 Va. 575, 580 (1978)). "Indeed, from the very nature of the offense, it often may be established only by indirect and circumstantial evidence," *id.* (quoting *Floyd*, 219 Va. at 580), and "[i]t is a rare case where any 'formal agreement among alleged conspirators' can be established," *Pulley v. Commonwealth*, 74 Va. App. 104, 120 (2021) (quoting *Carr v. Commonwealth*, 69 Va. App. 106, 118 (2018)). Accordingly, "a conspiracy may be inferred from the overt actions of the parties." *Speller*, 69 Va. App. at 389 (quoting *McQuinn v. Commonwealth*, 19 Va. App. 418, 425 (1994)). Where it is demonstrated that an accused and others, "by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object." *Id.* (quoting *Amato v. Commonwealth*, 3 Va. App. 544, 552 (1987)).

With respect to hypotheses of innocence, "[t]he Commonwealth . . . 'need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant.'" *Young v. Commonwealth*, 70 Va. App. 646, 653 (2019) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)). "The reasonable-hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Rams v. Commonwealth*, 70 Va. App. 12, 28 (2019) (alteration in original) (quoting *Moseley*, 293 Va. at 464). Accordingly, "[m]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded." *Ray v. Commonwealth*, 74 Va. App. 291, 308 (2022) (alterations in original) (quoting *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017)). "The fact finder 'determines which reasonable inferences should be drawn from the evidence[] and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant.'" *Young*, 70 Va. App. at 654 (alteration in original) (quoting *Moseley*, 293 Va. at 464). "Consequently, whether the evidence excludes all reasonable hypotheses of innocence is a 'question of fact,' and like any other factual finding, it is subject to 'revers[al] on appeal only if plainly wrong.'" *Id.* (alteration in original) (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016)). Ultimately, "the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

We reject appellant's argument that there was insufficient evidence that he entered into an agreement to kill White. As discussed above, ample circumstantial evidence and reasonable inferences from that evidence support the conclusions that appellant met others at 704 Macon

Road in Hampton shortly before the killing, that appellant and others then traveled from there to the apartment complex where White was killed, and that they returned to that address after the killing. This evidence includes the expert testimony about cell phone locations before and after the shooting and also the presence, in Cappe's white car at that address, of a cartridge case that was fired by one of the guns used to kill White. Additionally, the jury had before it extensive video surveillance footage of the behavior of White's killers at the apartment complex. The jury could reasonably infer from that footage that when the men who arrived in the white car left that car at staggered intervals, and then circulated throughout the apartment complex, they were looking for their intended victim, White. The jury could also reasonably infer from the behavior captured by the surveillance footage that when appellant and his two companions found White, and all simultaneously raised their arms at him and opened fire, they were acting in concert to fulfil an agreed and common plan to kill White.

We likewise reject appellant's argument that the evidence discussed above failed to exclude the possibility that White's shooting was a spontaneous, unplanned action rather than the product of a prior agreement to kill. The jury clearly rejected as unreasonable this theory of the events surrounding White's death, and based upon the evidence before us, we cannot say that their rejection was plainly wrong.

Accordingly, because a rational trier of fact could have found the evidence sufficient to convict appellant of conspiracy to commit White's murder, we find no error by the trial court in denying appellant's motion to strike.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court.

*Affirmed.*